IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIELLE SICKLES, individually and as Administrator of the estate of MARK SICKLES, )<br><br>Plaintiff,<br>v.<br><br>WESTERN CHEMICAL, INC.; ARGENT CHEMICAL LABORATORIES; GEORGIA PACIFIC CHEMICALS, LLC; MOMENTIVE SPECIALTY GROUP, INC.; BORDEN CHEMICALS, INC.; HEXION SPECIALTY CHEMICALS, INC.; and DOES 1-25,<br><br>Defendants. | Civil Action No. 10-0226 Erie |

## MEMORANDUM OPINION

**Conti, Chief District Judge**

### I. Introduction

This matter is before the court upon a joint motion for summary judgment (ECF No. 80) filed by defendants Georgia-Pacific Chemicals, LLC ("Georgia-Pacific") and Momentive Specialty Chemicals, Inc. ("Momentive" and together with Georgia-Pacific, "defendants"). In the underlying action, plaintiff Danielle Sickles ("plaintiff"), on behalf of her deceased husband, Mark Sickles ("Sickles"), filed a four-count complaint alleging: (1) defects in the design and marketing of industrial chemicals and solvents (Count I); negligence in the design and marketing of those same chemicals (Count II); a claim for wrongful death pursuant to 42 PA. CONS. STAT. § 8301 (Count III); and a survival claim pursuant to 42 PA. CONS. STAT. § 8302 (Count IV). (ECF No. 73.) This court has jurisdiction pursuant to 28 U.S.C. § 1332.

## II. Factual Background

The following facts are undisputed, except where otherwise noted. From 1983 through 2009, Sickles worked for the Pennsylvania Fish & Boat Commission as a laborer and fish culturist at a fish hatchery located in Linesville, Pennsylvania. (ECF No. 73 ¶ 12; Combined Statement of Material Facts ("C.S.F.") (ECF No. 93) ¶ 4.) During the course of his employment, Sickles worked directly with various toxic chemicals, including formalin and formalin-based products, which were used to prevent the growth of fungus in the hatchery's fish tanks. (ECF No. 73 ¶¶ 13, 23; C.S.F. (ECF No. 93) ¶3.) Sickles never received any warning or instruction concerning the need to utilize respiratory protection or otherwise take precautions to avoid injury from exposure to formalin. (C.S.F. (ECF No. 93) ¶ 4.) His exposure, however, to those chemicals frequently caused him to experience severe dizziness and illness. (Workers' Compensation Transcript ("W.C. Tr.") (ECF 82-5) at 10-12.)

On December 30, 2008, Sickles was formally diagnosed with pancytopenia, a medical condition marked by a decrease in red and white blood cells. (C.S.F. (ECF No. 93) ¶ 10.) At that time, Sickles' oncologist, Nimit Sudan, opined that "a bone marrow biopsy to rule out myelodysplastic syndrome" ("MDS") should be performed if Sickles' blood counts did not improve. (*Id.* ¶ 11.) On February 3, 2009, Sickles underwent a bone marrow biopsy that was "suggestive of MDS," although not conclusive. (*Id.* ¶¶ 12-13). Dr. Sudan discussed the possibility of an MDS diagnosis with Sickles and his wife at a follow-up meeting on February 17, 2009. (*Id.* ¶ 13.)

On June 1, 2009, another oncologist, Jason Brown, reviewed Sickles' medical records and agreed that his counts were "suggestive of MDS . . . but not conclusive." (C.S.F. (ECF No.

93) ¶ 14; ECF 82-1 at 6.) Dr. Brown noted that Sickles expressed concern about spending the "majority of the day" around "a very dirty work environment" in light of his low white blood counts. (C.S.F. (ECF No. 93) ¶ 14.) As a result, Sickles was directed to "stay off work for the next seven days given his [work] environment." (*Id*. ¶ 14.)

A second bone marrow biopsy was performed on June 15, 2009. (*Id*. ¶ 15.) Based on the results of that biopsy, Dr. Brown and another oncologist, Dr. Haifaa Abdulhaq, each issued a diagnosis of MDS. (ECF 82-1 at 8-11.) Dr. Brown again ordered Sickles to take time off work in light of the "very dirty environment" at the hatchery. (C.S.F. (ECF No. 93) ¶ 15.)

At a follow-up meeting on July 10, 2009, Dr. Brown noted that Sickles had again expressed "questions about work." (*Id*. ¶ 16.) As a result of his ongoing illness, Sickles' terminated his employment at the fish hatchery on September 1, 2009. (*Id*. ¶ 31.)

Sickles passed away on November 2, 2011. (*Id*. ¶ 5.) On December 29, 2011, plaintiff filed a Workers' Compensation Claim Petition seeking lost wages, medical bills, and death benefits as the result of Sickles' MDS diagnosis and eventual death. (*Id*. ¶ 21.) On the claim petition, plaintiff described her husband's illness as "Myelodyplastic syndrome, pancytopenia, leukemia, and related complication[s]." (*Id*. ¶ 22.) The claim petition also stated that the illness had resulted from "[e]xposure to chemicals including formaldehyde, tenzine and diquat" and that her husband's illness had occurred on his employer's premises. (*Id*. ¶ 24.) Finally, in response to a question on the claim petition concerning notice to the employer, plaintiff indicated that "[a]fter repeated episodes of falling ill after returning to work, [Sickles] and physician reported the environmental relationship to management" on or before September 1, 2009. (*Id*. ¶ 25.)

## III.   Procedural History

On September 7, 2010, Sickles commenced the instant lawsuit against Western Chemical, Inc. ("Western Chemical"), Argent Chemical Laboratories ("Argent Chemical"), and 25 John Doe defendants, alleging that Sickles' MDS was the result of his occupational exposure to a chemical manufactured, sold or distributed by one or more defendants. (ECF No. 1). The case was assigned to Judge Sean J. McLaughlin.

Following her husband's death, plaintiff, individually and as administrator of his estate, filed an amended complaint on February 26, 2012, restating the same operative facts and adding Georgia-Pacific, Borden Chemical, Inc. ("Borden"), and Hexion Specialty Chemicals, Inc. ("Hexion") as defendants. (ECF No. 41). Georgia-Pacific and Momentive[1] each moved to dismiss on the basis that plaintiff's claims against Georgia-Pacific and Momentive, filed over two years after his diagnosis with MDS, were time-barred. (ECF Nos. 56, 58). On December 13, 2012, Judge McLaughlin held an oral hearing at which plaintiff's counsel argued, for the first time, that Sickles had not discovered the alleged link between his illness and his exposure to formalin until April 24, 2010. (Hearing Transcript (ECF No. 92) at 4-6, 12). In light of the undeveloped nature of this allegation, Judge McLaughlin granted the defendants' motion to dismiss without prejudice, ordered plaintiff to file a seconded amended complaint, and granted a period of limited discovery to explore the potential application of the discovery rule to plaintiff's allegations. (*Id.* at 28-30.)

On January 3, 2013, plaintiff amended her complaint to add the following paragraph:

> On or about April 24, 2010, plaintiffs first suspected that a relationship possibly existed between Mr. Sickle's exposure to formalin or other chemicals at work, and his medical condition of Myelodysplastic syndrome, or pre-leukemia, not verified by a doctor, but based upon

---

[1] Following a series of mergers, Momentive is now the successor corporation to both Borden and Hexion. (ECF No. 75 ¶ 5)

> research conducted by his step-daughter, Sunni Loucks, who is a layperson. This started a search for the cause, which resulted in this claim.

(ECF No. 73 ¶ 17.) Georgia-Pacific and Momentive responded by filing the instant joint motion for summary judgment, again arguing that plaintiff's claims were untimely filed. (ECF No. 80.) Plaintiff filed a brief in opposition to that motion on July 3, 2013 (ECF No. 84) and defendants replied on July 15, 2013. (ECF No. 87.) On August 27, 2013, this matter was reassigned to the undersigned judge. (ECF No. 89.) The aforementioned motion is fully briefed and ripe for review.

### IV.  Standard of Review

Summary judgment may only be granted where the moving party shows that there is no genuine dispute about any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving

party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

**IV.    Discussion**

The sole basis for the instant summary judgment motion is that plaintiff's claims against Georgia-Pacific and Momentive are barred by the applicable statute of limitations. It is well-settled under Pennsylvania law that the statute of limitations governing each of the claims asserted in this action – negligence, strict liability, wrongful death and survival – is two years. *See* 42 PA. CONS. STAT. § 5524(2), (7) (stating that actions "to recover damages for injuries to the person or for the death of an individual" and "to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct" must be "commenced within two years"); *Debiec v. Cabot Corp.*, 353 F.3d 117, 128-29 (3d Cir. 2003) ("Pennsylvania has a two year statute of limitations for personal injury and wrongful death actions."). This two-year period typically begins to run "as soon as the right to institute and maintain a suit arises." *Debiec*, 353 F.3d at 128-29 (quoting *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)). Where a party, however, "through no fault of his or her own, does not discovery her injury until after the statute of limitations

normally would have run," the statute of limitations may be tolled until such time as "the plaintiff knows, or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *Id.* at 129 (citing *Cathcart v. Keene Indus. Insulation*, 471 A.2d 493, 500 (Pa. Super. 1984)). The party seeking to take advantage of this so-called "discovery rule" bears the burden of proving that it applies. *Dalrymple v. Brown*, 701 A.2d 164, 167 (Pa. 1997).

Defendants contend that there is ample evidence in the record to establish that Sickles was aware that his illness might have been caused by his exposure to formalin prior to terminating his employment at the hatchery in September 2009. Plaintiff responds that, although Sickles was diagnosed with MDS in 2009, he did not learn of the possibility that his injury might have been caused by another party's negligence until April 24, 2010. Because plaintiff's amended complaint was filed on February 26, 2012, this determination is dispositive.

In support of her contention that the limitations period was tolled until April 24, 2010, plaintiff avers that Sickles did not discover the potential link between formalin exposure and MDS until his step-daughter, Sunni Loucks ("Loucks"), presented him with the results of various internet searches she had performed on her laptop computer at work that day. (ECF No. 73 ¶ 17.) Loucks testified that she used msn.com over her lunch break to search terms such as "cause," "cure," and "life expectancy" in connection with MDS. (Deposition of Sunni Loucks ("Loucks Depo.") (ECF 83-6) at 16.) Loucks explained that her investigation stemmed in part from her frustration over the fact that that none of Sickles' physicians had attempted to identify the cause of his illness prior to that date. (*Id.* at 19.) According to Loucks, her investigation revealed a list of chemicals, including formalin, which had been previously linked to MDS. (*Id.* at 22.) Plaintiff and Loucks each testified that Loucks presented this list of chemicals to her

7

parents at dinner that evening and queried Sickles to determine whether he had ever worked with any of them. (Deposition of Plaintiff ("Pl. Depo.") (ECF No. 83-5) at 110-11; Loucks Depo. (ECF No. 83-6) at 22.) According to plaintiff, when Loucks mentioned formalin, Sickles turned "white as a ghost," became very upset, and acknowledged that he worked with formalin on a daily basis. (Pl. Depo. (ECF No. 83-5) at 111.) Plaintiff avers that this was "the first time that a connection was made associating [Sickles'] diagnosis of MDS and his exposure to formalin at work." (Affidavit of Danielle Sickles ("Sickles Aff.") (ECF No. 83-7) ¶ 8.)

Defendants respond that plaintiff's testimony is self-serving and unsupported, noting that neither plaintiff nor Loucks retained any documentation of the results of that internet search and that the two computers allegedly used to perform that research have each "crashed" and are no longer accessible. (C.S.F. (ECF No. 93) ¶¶ 35-36.) Defendants also contend that the record contains ample evidence to contradict plaintiff's testimony and establish that Sickles was aware of the possible link between MDS and formalin prior to leaving his employment at the fish hatchery in September 2009. For example, defendants observe that Sickles' physicians frequently ordered him to take time off work and that Dr. Brown's notes from 2009 reflect that Sickles had "questions" about the safety of his workplace in light of his medical condition and the "very dirty environment" in which he worked. (C.S.F. (ECF No. 93) ¶¶ 15-16.) Defendants also note that the claim petition used to initiate Sickles' workers' compensation proceedings states that he and his physician had reported concerns about his workplace to his employer prior to terminating his employment. (C.S.F. (ECF No. 93) ¶ 22.) Finally, defendants contend that plaintiff's sworn testimony in support of that claim petition further demonstrates that Sickles had discovered (or had reason to discover) the link between his illness and formalin exposure during the course of his employment. The referenced testimony, given in front of a workers'

compensation judge on March 16, 2012, contained the following exchange between plaintiff and her counsel:

> Q: Do you recall having any discussions with your husband concerning the various chemicals that he was in [sic] treating fish?
>
> A: Yes. A lot of times he talked about different things that - - how dangerous the chemicals were, he thought that, you know, we - -
>
> Q: Do you remember specifically the names of any of those chemicals?
>
> A: There was a formaldehyde and a Benzene something like that, it's like he worked with - -
>
> Q: Was it Formalin, is that it?
>
> A: Formalin, yes, Formala, Formalin, yeah.
>
> Q: What were his complaints about those chemicals?
>
> A: Just that he was constantly breathing, he was constantly in the water cleaning the tanks. . . . And he was always smelling that and he'd get dizzy and he'd come home dizzy and we didn't know why, but he thought that's probably what it was. So, finally he went to the doctor and they said that's - - - this is what - - - it's environmental, it's this stuff, you know, that's doing it to you.

(*Id.* at 13-14.) Plaintiff further testified that Sickles would

> come home from work and he'd have to hold onto the car before he got out or truck and come into the house and he'd have to sit down right away. He couldn't even come up the stairs because he was so dizzy. And this kept going on and we didn't know why so we went and . . . they took tests and found out it was Myelodysplastic Syndrome.

(*Id.* at 13-14.) Later, when asked to generally describe Sickles' treatment and progress following his MDS diagnosis, plaintiff stated:

> He – right away he did a bone marrow biopsy to see what was going on and he found out that's what it was. And he really didn't do anything

9

> quite right away, I don't think. But, he went back to work and he got sick again and he was back in the hospital and then he went back to work again for a week and he got sick and went back in the hospital and then he went back to work again for a week and then he got sick again and he said that's it, something there has to be doing this to you. So they made him quit. They put all two and two together . . .

(*Id.* at 14-15.)[2]

Plaintiff responds by arguing that defendant's characterization of the above-quoted testimony is misleading, noting that the sole object of that proceeding was to determine whether and when Sickles had become partially and totally disabled, rather than when he knew the *cause* of his illness. Consequently, plaintiff submits that her responses were extremely abbreviated and tailored only towards the narrow issue of her husband's disability. Plaintiff explains that, when placed in the appropriate context, her previous responses are not inconsistent with her position in the current litigation. For example, plaintiff notes that the workers' compensation proceedings were not instituted until 2011, long after her daughter's research had already revealed the connection between formalin and MDS. As a result, her testimony during those proceedings reflected conclusions drawn *after* her daughter's discovery of that connection, recounted with the benefit of hindsight, rather than a representation of her husband's awareness of the risks of formalin during the time period when he was still working. When given an opportunity at deposition to clarify her previous testimony, Plaintiff denied that she and her husband ever conversed about chemicals in the workplace during the time that he was actively employed:

> Q: So you said on March 16th, 2012 under oath and your answer was, "A lot of times we talked about different things that –

---

[2] Indeed, in light of plaintiff's testimony in the workers' compensation proceeding, defendants suggest that she should be judicially estopped from claiming that her husband remained unaware of the link between formalin and MDS until April 2010. It, however, is well-settled that a party attempting to survive summary judgment "in the face of her own contrary assertions made in a prior proceeding" must be given an opportunity to provide "a sufficient explanation" to adequately reconcile any apparent conflict. *Detz v. Greiner Ind., Inc.*, 346 F.3d 109, 115 (3d Cir. 2003) (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999)). Here, for reasons set forth more fully below, the court concludes that there is a disputed material issue of fact about whether plaintiff's prior testimony is inconsistent with her position in the current litigation.

|       | how dangerous the chemicals were, thought that, you know, we –"                                                                                                                              |
| ----- | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| A:    | Uh-huh.                                                                                                                                                                                        |
| Q:    | So are you saying now that that testimony was incorrect?                                                                                                                                       |
| A:    | Yes. Yes. We never talked about chemicals while – it was after we found out about chemicals we talked about it. Never during work –                                                            |
| Q:    | What do you mean –                                                                                                                                                                             |
| A:    | – all the years we were together.                                                                                                                                                              |
| Q:    | "Never during work," what do you mean?                                                                                                                                                         |
| A:    | He worked there 27, 28 years. He never talked about chemicals. He never worried about chemicals. It was never brought up, ever.                                                                |

(Pl. Depo. (ECF No. 83-5) at 9.) She explained that each of the other conversations referenced in her prior testimony, such as her husband's complaints about the smell of various chemicals and his frequent dizziness, also took place after her daughter's discovery:

> When we found out that he was working with formalin, we researched it. And they said that it does this and causes that. And then Mark says, "That's why I'm dizzy all the time. That's why this" - - you know, it just unfolded after days, you know, because he had a lot of down time. So he could start researching, and that's what he did.

(*Id.* at 106.) Finally, plaintiff posited that the notes in Dr. Brown's medical records pertaining to Sickles' fears about his work environment reflected concerns that his ongoing illness might make him vulnerable to additional infections, rather than suspicions that his illness had been *caused* by something in the workplace:

|    |    |
| -- | -- |
| Q: | [I]n that statement it says, "Claimant and physician reported the environmental relationship to management" – |
| A: | Oh. That was the dirty environment, yeah, because of his low white blood count. |

| | | |
|---|---|---|
| Q: | | What do you mean by "dirty environment"? |
| A: | | Have you been there? The ponds, the dirt, just everything, you know, working with fish and worried about infection. |
| Q: | | So what about working with fish? |
| A: | | If you get – if you got poked and you bled, he didn't have no – nothing to stop him from bleeding, no white blood count to stop any kind of infection. Just a lot of things, you know. |
| Q: | | So at the time that he left work in September of 2009, your husband was aware of an environmental relationship? |
| A: | | He was worried about how dirty it was and getting sick from infection. |
| Q: | | He was worried about how dirty what was? |
| A: | | The environment where he worked, the ponds and stuff. |

(*Id.* at 93-94).

After carefully reviewing the evidence summarized above, and drawing all reasonable inferences in favor of plaintiff, the court concludes that there is a genuine issue of material fact concerning the date on which Sickles first discovered that his MDS might have been caused by his exposure to formalin. Simply put, the record as a whole is entirely susceptible to conflicting inferences with respect to the timeline of Sickles' discovery of the potential link between MDS and exposure to formalin. Resolution of these issues will depend in large measure upon the credibility of plaintiff and the plausibility of her explanation for Sickles' failure to discovery the source of his illness prior to his step-daughter's internet investigation. Such determinations are fundamentally the province of a jury. As a result, defendants' request for summary judgment must be denied.

## V. Conclusion

Because a genuine issue of material fact exists concerning Sickles' discovery of the potential cause of his illness and the application of the discovery rule to the statute of limitations governing his claims, defendants' motion for summary judgment will be denied. (ECF No. 80.) An appropriate order follows.

            By the court:

           /s/ Joy Flowers Conti
           Joy Flowers Conti
           United States District Judge

Dated: October 23, 2013